[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, who resides in Bloomfield, Connecticut, commenced this action for dissolution of marriage with a complaint dated December 15, 2000. The return date in this matter was January 16, 2001. The defendant appeared by counsel on January 22, 2001, and, after various pre-trial proceedings, the matter was placed on the trial list.
A trial was held on September 6-7, 2001. Both parties were represented by counsel throughout the proceeding. The court has carefully considered all of the evidence introduced at trial, as well as the parties' financial affidavits and child support guideline worksheets, and finds that the facts set forth below were proven at trial.[1]
 FACTUAL, FINDINGS
The plaintiff whose maiden name was Jacqueline Morales, and the defendant were married on September 2, 1989 in Hartford. Both parties have resided continuously in Connecticut for more than one year, and the court has jurisdiction.
Two minor children were born as issue of the marriage: Jasmine Mickey, whose date of birth is October 10, 1990, and Danielle Mickey, whose date of birth is September 2, 1996. No other minor children have been born to the plaintiff since the date of the marriage. Neither of the parties nor the children are recipients of assistance from the State of Connecticut CT Page 13062 or any municipality thereof.
The plaintiff is currently employed as an associate manager with the Prudential Life Insurance Company. Her financial affidavit indicates that she receives a gross annual salary of $63,180. She has been employed by Prudential since October 2000. Prior to that, the plaintiff worked for approximately 11 years in marketing with the Traveler's Insurance Company. The plaintiff graduated from high school and attended one year of college. She was born on December 24, 1966.
The plaintiff lost a kidney when she was one year old. She has recently been experiencing medical problems with her remaining kidney, and is under a physician's treatment for that ailment. Her doctor prescribed medication for the condition, but there have been side affects related to that prescription and the amount of the dosage was recently reduced.
The defendant is a correctional officer with the State of Connecticut Department of Correction. He has held that job for approximately 14 years and earns gross annual wages of $61,922.64. The defendant attended college for two years and is a high school graduate. His date of birth is September 10, 1965.
The marriage has been troubled for a number of years. The plaintiff first filed for a dissolution of marriage in 1992. She testified credibly that the defendant's absences from home and admission of an extramarital affair prompted her to seek a divorce at that time. That action was withdrawn after the parties attended counseling and agreed to reconcile.
The plaintiff began another dissolution action in 1994. She testified credibly that the defendant was abusing drugs and alcohol at that time, and had acted irrationally toward her during one late-night incident at their home. The couple reconciled again after a period of separation.
During 1997, the defendant contemplated filing for divorce, but he abandoned those plans after conciliatory discussions with the plaintiff
In November 2000, the plaintiff learned that the defendant had been involved in an affair with a woman who was about to deliver a child conceived during that relationship. The defendant initially denied the relationship, but subsequently admitted to his wife that he had engaged in the affair and fathered the child, a son who was born on December 3, 2000. The plaintiff testified credibly at trial she had no prior knowledge of her husband's extramarital relationship, and that she had difficulty eating and sleeping, and lost considerable weight, after learning the news. During testimony at trial, the defendant admitted that he had continued to have marital relations with his wife during the CT Page 13063 period of time that he was engaged in the affair. The defendant also acknowledged that he had sexual relationships with "two or three women" other than the plaintiff during the course of the marriage.
On January 12, 2001, the defendant was arrested after he bit the plaintiff during a dispute at their home. As a result of that arrest, the criminal court issued a frill protective order which barred the defendant from entering the home, or initiating contact with the plaintiff (Plaintiff's Exhibits 10-11). The criminal court admitted the defendant to a diversionary program of family violence education, and the protective order will expire in February 2002 if the defendant successfully completes that program.
On January 31, 2001 the court (Caruso, J.) issued pendente lite orders in this case. The defendant was ordered to pay $200 per week as child support to the plaintiff and 47 per cent of the children's day care and summer care expenses. Judge Caruso also ordered that the defendant ". . . continue to carry the wife and children on his medical insurance and automobile insurance," and pay $100 per week toward expenses of the household.
On March 26, 2001 the defendant fled a motion to modify Judge Caruso's pendente lite order concerning payment of the $100 weekly sum for household expenses. The plaintiff filed a motion alleging that the defendant is in contempt for failing to maintain the wife on his group medical insurance, for failing to pay the household expense contributions, and for failing to pay the automobile insurance premiums. By agreement of the parties, the court heard the modification and contempt motions during this trial.
Clear and convincing evidence established that the defendant removed his wife from his State of Connecticut group medical insurance policy on July 1, 2001 without notifying her or seeking approval of the court. (Testimony of plaintiff and Plaintiff's Exhibit 5). The plaintiff first learned of the loss of her medical insurance coverage when she went to fill a prescription for her kidney medicine. As a result of being removed from the group medical policy, the plaintiff incurred out-of-pocket medical and prescription costs of $468.99. Although the defendant contended at trial that he believed that he could terminate the coverage because he was then "legally separated"from the plaintiff;[2] the court does not credit that explanation. The defendant had enrolled his infant son for coverage under his group medical insurance policy shortly after the child was born. The defendant was therefore familiar with the mechanics of dependent enrollment. That fact, the lack of notice to the plaintiff; the defendant's implausible explanation, and the actions of the defendant in shutting off certain utilities at the marital home (as CT Page 13064 discussed below), lead the court to find by clear and convincing evidence that the defendant contemptuously terminated the plaintiff's medical insurance in defiance of both Judge Caruso's pendent lite orders, and the standing orders of the court which took effect when the dissolution action was filed. The court finds the defendant in contempt for his actions in ending the plaintiff's medical insurance.
The court also finds by clear and convincing evidence that the defendant willfully failed to comply fully with the orders that he contribute $100 per week toward weekly expenses, pay 47 per cent of the child care and summer care expenses, and pay the automobile insurance expenses. The defendant admits that he has not paid these sums, but argues that he was financially unable to comply with the court's "orders. Here, too, the court is unpersuaded. The defendant's January 31, 2001 financial affidavit indicates that his gross annual income was $54,179.84. The financial affidavit which he submitted on September 7, 2001 reflects gross annual income of $61,922.64. The defendant claims the increase in his salary is due to holiday work which is not guaranteed in the future. Nonetheless, his wages substantially increased since Judge Caruso issued the pendente lite orders in January. Furthermore, credible evidence at trial established that the defendant received an income tax refund of $2,649 sometime between February 3, 2001 and the present (Plaintiff's Exhibit 3), and that he traveled with a female friend to a softball tournament in South Carolina within the past several months. These facts contradict the defendant's claims that he was financially unable to comply with the orders, and that there has been a material and substantial change in his financial circumstances which justifies modification of the order that he contribute to the household expenses. The court finds that as of September 6, 2001, the defendant owes arrearages to the plaintiff of $2,250 for household expenses, $403.94 for day care, $142.50 for summer camp[3] and $276 for auto insurance premiums. The court finds the defendant in contempt for his willful failure to pay those sums, and denies the defendant's motion to modify.
Shortly after his removal from the family home, the defendant contacted the gas company and cable company and terminated those utility services to the marital home. The defendant took this action unilaterally, without advance warning to the plaintiff, and despite the fact that the plaintiff and the two minor children were living in the premises. The plaintiff discovered that the gas had been shut off when she awoke one morning and found the house cold and without heat. The defendant testified that this happened when he attempted to establish utility accounts in his name at his new apartment. He claimed that the utility companies would not permit two accounts in his name at two different locations. The court does not credit this testimony. The defendant successfully established telephone service at his new apartment by listing that utility account in a CT Page 13065 friend's name. The defendant did not alert his wife that he was switching the gas and cable accounts to his new apartment. Accordingly, the plaintiff had no opportunity to continue the service by changing the accounts to her name, and she had no warning that the utilities would be shut off. Furthermore, the court does not believe that either utility would have terminated the plaintiff's service had they been advised by the defendant that his former residence was still occupied by other family members. The court finds that the defendant acted in retaliation against the plaintiff when he caused the termination of the gas and cable services to the family home. In this instance, the court finds that the defendant's anger toward his wife clouded his judgment and blinded his recognition of what was in the best interests of his children.
Although the parties agree that the primary residence of the children should be with the plaintiff they disagree about how this court should fashion custody orders. The plaintiff seeks sole custody. At trial, she claimed that she has been the primary decision maker with respect to the children's care. She also expressed concern regarding the defendant's alleged substance abuse and what she claimed was his "inconsistency" with the children.
The defendant seeks joint custody of the children. At trial, he denied that he has a current substance problem, but admitted that he abused alcohol and drugs in the past. At some point prior to trial, the court's Family Services unit recommended that the defendant voluntarily submit to random drug testing to resolve the issue of possible substance abuse. No drug testing was done prior to trial. Based on the evidence presented, the court is unable to make a definitive finding as to whether or not the defendant is currently abusing drugs or alcohol, or how such a problem, if one exists, affects his capability to parent. However, the court concurs that a substance abuse evaluation of the defendant, and random drug screening of the defendant, are necessary to resolve the custody and visitation dispute in this matter.
As noted above, the parties have been separated since the protective order was issued by the criminal court last January. The children have been in the plaintiff's sole custody since then. The defendant claimed at trial that his involvement with both girls has been more extensive than that indicated by the plaintiff. Weighing the testimony of each of the parties, the court finds that although the defendant has a loving parental relationship with both children, the plaintiff has been their predominant care-giver throughout the marriage.
The plaintiff has completed the statutorily-mandated parenting education program. The defendant has not taken the required parenting course. At trial, the defendant claimed that adverse financial CT Page 13066 circumstances prevented him from doing so. Based on the findings set forth above concerning the defendant's annual income and recent tax refund, the court does not accept that explanation as credible.
Virginia Kovaleski, a family relations counselor testified at trial and issued written recommendations concerning custody and parental access. (Plaintiff's Exhibit 4). Ms. Kovaleski recommended that the parties share joint legal custody and that the children reside primarily with the plaintiff. She also recommended that Mr. Mickey submit to court-ordered random drug tests and a substance abuse evluation, and cooperate with treatment if it is recommended by the evaluator. Ms. Kovaleski also suggested an interim parenting schedule for the defendant that could be implemented ". . . while the substance abuse issue is being assessed." (Plaintiff's Exhibit 4). The court will make findings and rulings with respect to Ms. Kovaleski's testimony and recommendations in its orders below.
Both the plaintiff and the defendant have worked industriously throughout the marriage and have provided well for the family unit.
Several years ago, the parties purchased the family home at 1 Tiffany Lane in Bloomfield The property's fair market value is $141,000, there is an outstanding mortgage balance of approximately $105,000, and the equity in that asset is approximately $36,000.
The parties own two automobiles, a 1997 Oldsmobile LSS and a 2000 Dodge Caravan.
The financial assets in the plaintiff's name include a Smith Barney investment account ($2,594.08); Sovereign New England Bank savings and checking accounts ($750); a Prudential Employee Savings Plan ($3,037.08); a Traveler's Group 401K Savings Plan ($23,371.02) and a Citigroup Defined Benefit Pension Plan account, the value of which will be discussed further below.
The financial assets in the defendant's name include a C.S.P. Federal Credit Union savings and checking accounts ($100); an Aetna deferred compensation plan ($6,600); a Phoenix Investments deferred compensation plan ($411.68); a Hartford Life deferred compensation plan ($14,396.22); and a pension through the State of Connecticut Employee Retirement System, the value of which will be discussed further below.
As noted above, the plaintiff has a pension through her former employer, Travelers Insurance (Citigroup). James A. Gobes, an actuary retained by the plaintiff, evaluated the plaintiff's Citigroup pension and prepared a written report which was introduced into evidence by CT Page 13067 agreement of the parties. (Plaintiff's Exhibit 2). Mr. Gobes did not testify at trial. His report indicated that the plaintiff would receive $197.75 per month from this pension when she reached age 55. Mr. Gobes' report also stated:
 "The present value of this benefit is $8,646. This does not include the value of her Citigroup Cash Balance account." (Plaintiff's Exhibit 2).
At the plaintiff's request, Mr. (lobes also evaluated the value of the defendant's pension with the State of Connecticut and prepared a written report, which was also admitted into evidence. (Plaintiff's Exhibit 1). Mr. Gobes opined that based on the defendant's 14 years of service, Mr. Mickey would receive $780 per month from the pension at age 55. (Plaintiff's Exhibit 1).
A letter dated May 7, 2001 from Nancy L. Wilson, a retirement systems coordinator at the State Comptroller's Office, was also offered into evidence at trial.(Plaintiff's Exhibit 8). Ms. Wilson did not testify at trial. Her letter indicated that the defendant is a hazardous duty member of the Tier II Plan of the State Employee Retirement System (SERS) who has accrued approximately 14 years of credited service for retirement purposes as of May 7. (Plaintiff's Exhibit 8). Ms. Wilson's letter indicated that the defendant must serve 20 years of credited service as a hazardous duty employee in order to qualify for a higher paying hazardous duty pension under a contributory plan. Noting that the defendant had been a correctional officer for 14 years, she wrote: "Our review confirms that Mr. Mickey does not qualify for a hazardous duty retirement at this time but that he is vested; and therefore, we can provide you with an estimate of the value of this benefit plan . . . If Mr. Mickey terminated state service today with 14 years of credited service and an average salary of $55,600 for his three highest years of paid state service, his basic yearly retirement benefit would be approximately $9,400 payable at $780 monthly."(Plaintiff's Exhibit 8).
The court found the information contained in Ms. Wilson's letter to be credible, and accepts it as fact. The court finds that the defendant is vested in the Tier II non-contributory pension plan, and that based on his current years of service, he has already qualified to receive a monthly benefit of approximately $780 from that pension at age 55. He would qualify for a higher hazardous duty monthly payment under a contributory plan if he serves approximately six more years as a correctional officer. The defendant has paid $19,193.53 in contributions and $4,283.78 in awarded interest into his hazardous duty pension account. That money would be refunded to the defendant if he left state service without qualifying for a hazardous duty pension. CT Page 13068
Mr. Gobes' report indicated that the defendant's pension entitlement with the state has a current value of $164,850. However, he also indicated that this calculation was predicated on the assumptions that Mr. Mickey would work in his hazardous duty position for another six years and thereby qualify for a higher paying hazardous duty retirement at age 41. (Plaintiff's Exhibit 1). Since the defendant has only worked 14 years and cannot qualify for a hazardous duty pension unless he works six more years as a correctional officer, the court finds that the actuary's claim that the pension has a present value of $164,850 to be speculative at best. The court does not accept that valuation, and finds that it does not accurately reflect the present actual value of the defendant's pension asset.
When the defendant retires, he may either elect to receive full pension benefit payments without a survivorship option, or a reduced pension benefit with guaranteed benefit payments to a survivor beneficiary.
Under the provisions of the defendant's plan, the defendant may not elect a survivor beneficiary until he retires. If he has remarried at that time, the defendant's new spouse could object to the designation of the plaintiff as a survivor beneficiary, notwithstanding any order of this court. (Testimony of Atty. Karen McDonough). The SERS plan is not subject to Federal ERISA requirements pertaining to Qualified Domestic Relations Orders issued by the court. (Plaintiff's Exhibit 8 and testimony of Atty. Karen McDonough.) However, Ms. Wilson stated in her letter that ". . . . SERS will divide a member's benefit in recognition of child or spousal support obligations when so ordered by a Connecticut court, providing such order is not contrary to plan provisions."(Plaintiff's Exhibit 8).
The defendant's financial affidavit lists debts of $15,312.00. The plaintiff's financial affidavit lists debts of $750. Neither financial affidavit indicated that any of the debts are joint, although the defendant's affidavits indicates that several of his larger debts were incurred over a period of time from 1994 or 1995 to the present.[4]
There was little evidence at trial concerning the reason for the debts. Therefore, the court is unable to make competent factual findings concerning the debts, and will make no orders concerning their allocation.
 FINDINGS AND ORDERS
The court has carefully considered all of the evidence introduced at trial, as well as the provisions of Connecticut General Statute Sections46b-56, 46b-56a, 46b-62, 46b-66a, 46b-81, 46b-82 and 46b-84, in making CT Page 13069 the findings and orders set forth below.
DISSOLUTION: The court finds that the marriage of the parties has broken down irretrievably. A judgment dissolving the marriage may enter.
CUSTODY: Sole custody of the two minor children is awarded to the plaintiff; subject to the defendant's reasonable rights of visitation, as set forth below. The court has considered the provisions of C.G.S. 46b-56a
and the testimony and recommendations of the Ms. Kovaleski, the family relations counselor. The court found Ms. Kovaleski's testimony to be credible, and her recommendations to be very thoughtful and professional. However, the court finds that it would not be in the best interests of the children to issue an order of joint legal custody at this time.
Joint legal custody requires a degree of cooperation and communication between the parents that does not presently exist in this case. The existing criminal protective order, which will be in place until February 2002, prohibits the defendant from initiating contact with the plaintiff. The defendant has to date failed to comply with the legal requirement that he attend a parenting education course. The defendant's actions in cutting off the plaintiff's medical insurance and utilities and in willfully failing to comply with some of the court's pendente lite financial orders suggest that he is presently incapable of cooperating with the plaintiff about decisions affecting the children.
The court orders that defendant immediately enroll in, and successfully complete, the parenting education course. The court further orders that the defendant submit to random drug tests as requested by the family relations office, and a substance abuse evaluation as directed by the family relations office. The defendant shall sign an authorization permitting the family relations office, and this court, to receive the results of the drug tests and substance abuse evaluations. The defendant is also ordered to contact Ms. Kovaleski within 10 days of the date of this judgment to make arrangements for said screening and evaluation, and to cooperate with any follow-up treatment recommended by the substance abuse evaluator.
The defendant shall visit with the minor children on Wednesday and Thursday evenings from 4 p.m.-8 p.m., and each weekend on either Saturday or Sunday (depending on his work schedule) from 10 a.m.-8 p.m. The defendant is not to use alcohol or illegal drugs while the minor children are with him.
The court intends that the forgoing orders are interim orders, pending the defendant's completion of the parenting education course, and drug CT Page 13070 screening and a substance abuse evaluation. The court also orders additional assessment by the Family Relations Office and directs that it submit further recommendations to this court concerning custody and visitation once the defendant has complied with the orders enumerated above
CHILD SUPPORT: In accordance with state child support guidelines, the defendant shall pay to the plaintiff as weekly child support the sum of $200 per week by immediate wage garnishment. Until the wage execution is effectuated, the defendant shall pay the weekly child support payments directly to the plaintiff. The parties shall share the daycare and summer camp expenses of the minor children on the following basis: 40 per cent paid by the defendant and 60 per cent paid by the plaintiff
MEDICAL INSURANCE: The defendant shall maintain such medical and dental insurance coverage as is available through his employment for the benefit of the minor children, until each child attains the age of majority or graduates from high school, whichever event occurs last. In no event shall the obligation to provide this insurance extend beyond the youngest child's 19th birthday. The court further orders with respect to said medical insurance that all the provisions of C.G.S. 46b-84 (e) shall apply.
In accordance with state guidelines, the defendant shall pay 40 per cent of all medical, dental, orthodontic, prescriptive, psychiatric, psychological and other medically-related expenses of the minor children which are not reimbursed by insurance. The plaintiff shall pay the remaining 60 percent of all such expenses.
PERIODIC ALIMONY: The defendant shall pay periodic alimony in the amount of $1.00 per year to the plaintiff. Said alimony shall terminate upon the death of either party, or the remarriage of the plaintiff
CONTEMPT ARREARAGE: The plaintiff incurred medical expenses of $468.99 during the period of time that the defendant contemptuously terminated her medical insurance coverage. The defendant also contemptuously failed to pay the plaintiff the following sums: $2,250 for household expense contributions; $403.94 for day care expenses; $142.50 for summer camp expenses; and $267 for automobile insurance premiums. The court finds that the defendant owes the plaintiff a total arrearage of $3,532.43 for the forgoing sums. The defendant shall pay said arrearage to the plaintiff at the rate of $30.00 per week, until the arrearage is fully satisfied. The weekly arrearage payments shall also be made by immediate wage garnishment. Until the wage execution is effectuated, the defendant shall pay said weekly arrearage payments directly to the plaintiff. CT Page 13071
LIFE INSURANCE: The plaintiff shall maintain in full force and effect the Kemper Life Insurance policy with the face amount of $250,000, and any other life insurance policies currently insuring her life, until the youngest child of the marriage attains the age of majority, or graduates from high school, whichever event occurs last. In no event shall the plaintiff's obligation to provide this insurance coverage extend beyond the youngest child's 19th birthday. The plaintiff shall pay all premiums due on said life insurance policies and shall annually provide proof to the defendant that said life insurance remains in full force and effect. The plaintiff shall name the minor children as the sole beneficiaries of said life insurance policies until the youngest child attains the age of majority or graduates from high school, as specified above.
The defendant shall maintain in full force and effect the Travelers Life Insurance policy with the face amount of $100,000[5], the Reliastar Life Insurance policy with the face amount of $50,000, the State of Connecticut group life insurance policy with the face amount of $35,000, and any other life insurance policy currently insuring his life, until the youngest child of the marriage attains the age of majority, or graduates from high school, whichever event occurs last. In no event shall the defendant's obligation to provide this insurance extend beyond the youngest child's 19th birthday. The defendant shall pay all premiums due on said life insurance policies and shall annually provide proof to the plaintiff that said life insurance remains in full force and effect. The defendant shall name the minor children as the sole beneficiaries of said life insurance policies until the youngest child attains the age of majority, or graduates from high school, as specified above.
REAL PROPERTY: The defendant shall forthwith quitclaim to the plaintiff all of his right, title and interest in the jointly owned real property at 1 Tiffany Lane, Bloomfield, Connecticut. The plaintiff shall assume, pay and hold the defendant harmless from the mortgage owed on said premises in the approximate amount $105,000.
In consideration for said conveyance, the plaintiff shall forthwith tender to the defendant her promissory note in the amount of $10,000, which shall be secured by a second mortgage from the plaintiff to the defendant on the premises at 1 Tiffany Lane, Bloomfield, Connecticut. Said note shall accrue simple interest at the rate of 3 per cent per year, and shall be due and payable by the plaintiff to the defendant upon the first happening of the following events: the plaintiff's death, the plaintiff's remarriage, cohabitation by the plaintiff with a man for purposes similar to marriage, or the 18th birthday of the youngest child of the marriage. CT Page 13072
Plaintiff's counsel shall prepare the mortgage deed and note, and defendant's counsel shall prepare the quitclaim deed. The parties are ordered to properly execute all documents necessary to effectuate the forgoing orders.
OTHER ASSETS: The plaintiff shall exclusively own the Sovereign New England checking and savings accounts ($750); the Smith Barney investment account ($2594.08); the Prudential Employee Savings Plan account ($3,037.08); and the Travelers 401K savings account ($23,371.02).[6]
The plaintiff shall also exclusively own the 2000 Dodge Caravan automobile, and shall assume, pay and hold the defendant harmless from any indebtedness owed thereon.
The defendant shall exclusively own the C.S.P. Federal Credit Union checking and savings accounts ($100); the Aetna deferred compensation plan ($6,600); the Phoenix Investments deferred compensation plan ($411.68) and the Hartford Life deferred compensation plan ($14,396.22). The defendant shall also exclusively own the 1997 Oldsmobile LSS automobile, and shall assume, pay and hold the plaintiff harmless from any indebtedness owed thereon.
The parties are ordered to properly execute all documents necessary to effectuate the forgoing orders with respect to the transfer of motor vehicles.
The plaintiff shall retain, for the benefit of the minor children, the two Putnam Investment accounts, each in the amount of $2,054.39. The defendant shall retain, for the benefit of the minor children, all savings bonds of the children which are in his possession.
The plaintiff has submitted a list of personal property which she proposes to return to the defendant. That list was attached as "Schedule A" to the proposed orders that the plaintiff filed with the court on September 6, 2001. The property listed on that schedule shall be owned exclusively by the defendant. This court may not modify the current "no contact" criminal protective order set by the criminal court, and hence cannot order that defendant retrieve said property from the Bloomfield home with a police escort. The court does order that the defendant make appropriate arrangements to retrieve this personal property, either by seeking permission of the criminal court, or by designating a surrogate acceptable to the plaintiff who could go to the family home and remove the personalty. The defendant shall remove said personal property from the family home within 60 days of the date hereof. If said property is not removed within 60 days of the date hereof, the defendant's interest therein shall be deemed abandoned, and the plaintiff shall thereafter CT Page 13073 exclusively own said property. All other personal property of the marriage shall be retained by the party currently in possession thereof.
PENSIONS: The plaintiff shall retain and exclusively own all of her interest in her Citigroup pension account.
The court enters the following orders, pursuant to C.G.S. 46b-81, for the division of the defendant's pension benefits under the provisions of the Connecticut State Employees Retirement System:
The plaintiff shall be entitled to, and the defendant's SERS pension plan shall pay to her, 40 per cent of the defendant's monthly retirement benefit payment. It is the court's intention that the plaintiff receive 40 percent of the defendant's monthly retirement benefit payment under the contributory hazardous duty retirement plan should he qualify for same, or 40 per cent of the defendant's monthly retirement benefit payment under the non-contributory Tier II plan should he fail to qualify for a hazardous duty pension. Should the defendant leave state service prior to qualifying for a hazardous duty pension and apply for a refund of his contributions and awarded interest posted to his hazardous duty pension account, then the plaintiff shall be entitled to, and the defendant's SERS pension plan shall pay to her, 40 per cent of the defendant's current contributions of $19,193.53, 40 per cent of awarded interest of $4,238.78, and 40 per cent of future awarded interest on said current contributions.
The defendant shall not make any election to receive any lump sums from his pension plan, or to roll over sums from his pension plan into an individual retirement account (with the exception of the refund of his hazardous duty contributions, as specified above).
To the extent allowed under the defendant's SERS pension plan, the defendant shall name the plaintiff as the irrevocable survivor beneficiary of 40 per cent of any and all survivor benefits which can be paid under the plan to a survivor of the defendant upon his death. The court is aware that the defendant is not permitted by his plan to designate a survivor beneficiary until the date of his retirement. The court is also mindful that if the defendant has remarried at the time of his retirement, his spouse could object to the designation of the plaintiff as a survivor, and, under the provisions of the plan, such objection would prevent the plan from permitting the plaintiff's designation as a survivor beneficiary. The court has considered that possibility, plus evidence at trial about the plaintiff's medical condition, in connection with its decision to award $1 per year alimony to the plaintiff. CT Page 13074
Counsel for the plaintiff is ordered to prepare such order as is required under the defendant's SERS pension plan in order to effectuate the forgoing orders, and submit it the defendant's counsel and this court, for its review and approval, within 30 days of the date hereof. This court will retain jurisdiction to amend this order only for the purpose of establishing or maintaining its validity and enforceability under the plan. Both parties and their counsel are ordered to sign all documents required to effectuate the forgoing orders.
COUNSEL FEES: The defendant shall pay to the plaintiff as a contribution toward her attorneys fees, the sum of $6,000 within 60 days of the date hereof.
MAIDEN NAME: The plaintiff is restored to her maiden name, Jacqueline Morales.
So ordered.
BY THE COURT:
Dyer, J.